# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                                    No. 1:21-cr-00294-JCH-1

JOHN CHAVEZ,

     Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant John Chavez's Motion to Suppress Statements and Physical Evidence and Request for an Evidentiary Hearing. ECF No. 38 (Mot.). The motion is fully briefed, *see* ECF Nos. 45 (Resp.), 48 (Reply). The Court held an evidentiary hearing on January 13, 2022. Having considered the motion, briefs, evidence, and being fully informed of the premises, the Court **DENIES** the motion.[1]

## FACTUAL FINDINGS

### A. Initiation of the Investigation into Defendant

In summer 2020, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent Wozniak covertly purchased a firearm from a convicted felon named William Gonzales. Resp. at 4; Motion to Suppress Hearing Transcript 7:11-18 (Hr'g Tr.). Agents traced the firearm to a firearm dealer called BMC Tactical. *Id*. at 8:1-2. ATF Form 4473 indicated that Defendant

---

[1] The portion of Defendant's motion requesting an evidentiary hearing is denied as moot because the Court has held a hearing.

was the original purchaser of the weapon and the form listed his address.[2] *Id*. at 8:24-25 – 9:1-5; 9:25-25-10:1-5.  The trace also showed that Defendant had made three additional firearm purchases during the same transaction. *Id*. at 90:1-3. Defendant allegedly certified on the Form 4473s that he was the purchaser and transferee of the firearms. *Id*. at 11:22-25.

### B. November 10, 2020 Encounter Between Agents and Defendant

On November 10, 2020, at about 12:30 p.m.,[3] Agents Wozniak and Hutson, in plainclothes, went to the address that Defendant listed as his home on ATF Form 4473s when purchasing the firearms. *Id*. at 44:3-5. Agents recorded the encounter. Govt.'s Ex. 7. After encountering Defendant's father, they identified themselves and asked the father if he was familiar with the ATF. *Id*. at 15:11-14; Transcript of Interview/Confession of John Chavez, 2:13-25 – 3:1-4, Govt.'s Ex. 1, ECF No. 45-1 (Nov. 10 Tr.) Agents asked for, and obtained, the father's permission to enter the property. *Id*. at 3:21-22.

Upon meeting Defendant, agents identified themselves as ATF agents and asked Defendant to speak in a more private location. *Id*. at 3:25 – 4:1-10. He declined, saying that "[r]ight here would be good," *id*. at 4:11-12, and the "bulk of the interview" was conducted on Defendant's front porch as Defendant stood in the doorway. Hr'g Tr. at 15:1-4, 16:3-6. Although

---

[2]     When purchasing a firearm from a federally licensed dealer, the buyer is required to fill out ATF Form 4473, which requests the buyer's name, date of birth, address, and other information. *See Abramski v. United States*, 573 U.S. 169, 171–73 (2014).   Form 4473 apparently asks the purchaser if he or she is "the actual transferee/buyer of the firearm(s)" and warns the purchaser: "You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you." *Id.* at 173. The dealer asks this question in part to ensure that the buyer of the firearm is not a straw purchaser, which refers to a person who falsely represents himself as the actual buyer of the firearm. *United States v. Reese*, 745 F.3d 1075, 1078 (10th Cir. 2014).

[3]     Although the transcript of the recording from the November 10 encounter indicates that the interview took place at 12:30 p.m., Agent Wozniak testified that the encounter took place at 11:30 a.m. This discrepancy has no impact on the legal analysis given that Agent Wozniak testified that the interview occurred "[n]ear the middle of the day." Hr'g Tr. at 15:16-17.

agents had awoken Defendant, he understood what agents were saying to him. *Id*. at 88:1-16, 99:14-17.

Agent Huston then proceeded to explain to Defendant that ATF agents "look into … gun stores and how they operate," and explained that part of their job was to audit gun stores' reported sales. Nov. 10 Tr. at 4:15-21. Wozniak testified that by putting questions to a suspect "as though the gun dealer is the subject of our inquiry, it puts people less on the defensive," and Wozniak agreed that this technique was a "ruse." Hr'g Tr. at 18:22-23, 19:10-12.

Without any prompting by the agents, Defendant responded, "Oh, okay …. I honestly sold my, uh, guns back to, um, the Value Pawn. So now Value Pawn has some of them. Um, basically, the only reason I sold my guns is because I needed to have my house paid for." Nov. 10 Tr. at 4:22-25 – 5:1-2.

Hutson produced a Form 4473 and asked Defendant if "the sale of four Glocks from BMC Tactical back in May" looked familiar, and asked Defendant if he signed the form and checked boxes certifying certain information. *Id*. at 6:24, 7:23-24, 8:22-25 – 9:1-2. Defendant answered yes and stated that the four Glocks were the same ones that he sold to Value Pawn. *Id*. at 7:25 – 8:1-2. Upon further questioning, however, Defendant stated that he only sold two of the four Glocks to Value Pawn, and that he sold one Glock to a colleague and retained another Glock in his possession. *Id*. at 11:12-18. Agent Wozniak asked Defendant for proof of a receipt of the sale of guns to Value Pawn, but Defendant could not produce one. *Id*. at 23:11-18.

Wozniak then apparently showed Defendant a photograph of Gonzales and asked him if he knew Gonzales. Hr'g Tr. at 53:2-10. Defendant denied knowing the individual, saying he had "never seen that person." Nov. 10 Tr. at 26:1-2. Wozniak told Defendant, "that's your gun in his pocket," to which Defendant responded, "What the fuck?" *Id*. at 26:5-8.

Wozniak then explained "the way the tracing process works," and suggested that that process led agents to Defendants. *Id*. at 26:20-21, 27:2-13. Wozniak then told Defendant, "it is a crime to lie to us." *Id*. at 28:14. He continued, "[i]f everything checks out with Value Pawn, then you don't have anything to worry about." *Id*. at 28:16-18. But "[i]f there's anything that you haven't told us that you feel like we should know that you'd like to change," he said, "we'll forget about everything before. And we can start over." *Id*. at 28:18-24.

Defendant said he wished to start over and then proceeded to explain that he did not sell the guns to Value Pawn at all but instead sold the guns to "a couple [of] friends" because of financial difficulties. *Id*. at 29:4-7. He told them about his wish to pursue a career in law enforcement, said "I know you guys are cops," and explained that he had no bad intentions when selling the guns. *Id*. at 29:3-4, 13-14, 30:17-20, 31:14. Hutson then told Defendant that being honest was "the best thing you can do." *Id*. at 32:18-22. Defendant's story then changed again, and he admitted to selling the four guns to a single individual, El Chapo, rather than a couple of friends, as he earlier stated. *Id*. at 33:24-25 – 34:1-5.

"So what else did you tell us that wasn't accurate?" Hutson asked. *Id*. at 38:25 – 39:1. "[T]hat's basically it, just … I bought those ones," Defendant said. *Id*. at 39:2-3. Wozniak asked how many additional guns Defendant purchased in the last months, and Defendant answered that he had only purchased two – a FN-45 and a Glock 19X – that he purchased from a store called JCT. *Id*. at 39:7-25.

Defendant said that he had not purchased anything from BMC Tactical lately. *Id*. at 40:15-16. In response, Hutson showed Defendant a Form 4473 showing that Defendant bought two firearms, a Glock 17 and a Glock 19, a month earlier from BMC Tactical. *Id*. at 41:1-21.

Defendant admitted that his signature was on the form and he claimed that he sold the Glock 17 to JCT and sold the Glock 19 to El Chapo. *Id*. 42:2-25.

At this point Wozniak told Defendant that he found his story – of "buying guns randomly" yet "selling them to the same person" – incredible. *Id*. at 44:3-25 – 45:1-5. He accused Defendant of minimizing his role and hoping to "keep El Chapo out of it ….," which Defendant denied. *Id*. at 44:16-19. Wozniak told Defendant that if Defendant lied, then agents could not help him and said that if "El Chapo's getting people to buy guns for him," then Wozniak "need[ed] to know that." *Id*. at 46:6-7. Wozniak said, "Because the guns that were recovered … I bought one of them undercover" and said that Defendant would "find [himself] … in the deep end of the pool," if Defendant did not provide accurate information. *Id*. at 46:12-19.

Defendant then told the agents that El Chapo threatened to hurt him and his family unless Defendant purchased guns for El Chapo. *Id*. at 47:3-15. Initially Defendant said that he purchased firearms for El Chapo twice. *Id*. at 56:7-8. But after agents told him that he "left something out," and to "make sure [to tell] us everything right now," Defendant admitted that he made a third purchase at JCT of a Desert Eagle pistol. *Id*. at 57:10-12, 21-22.

Wozniak retrieved Form 4473 for the sale of the four Glocks from BMC Tactical and asked Defendant if he lied when he represented himself as "the actual transfer buyer of firearm[s] listed on" the form. *Id*. at 60:1-9. Yes, Defendant said, and he admitted to "the [Glocks] 19 and 17 as well," but he repeated that he was "being threatened" by El Chapo. *Id*. at 60:10-11, 15-16. He also admitted to lying on the form for the Desert Eagle purchase. *Id*. at 64:12-21. Hutson asked Defendant: "[J]ust so I'm clear: It sounds like you had three transactions where you lied on the form for El Chapo, right?" *Id.* at 64:7-9. Defendant answered, "[Y]ea." *Id*. at 64:13-14.

Agents then told Defendant they would like to search his cellphone and to verify the two guns that Defendant claimed to have in his possession. *Id*. at 76:3-24. Defendant said that he had two cellphones – an old one and a new one – and that his correspondence with El Chapo was on the old one. *Id*. at 78:3-8. Hutson said, "I can't make you do this," but asked for "permission to look at both your phones so I can see … text messages with this guy [El Chapo] and get his number and stuff like that." *Id*. at 77:9-13. Defendant responded, "okay." *Id*. at 77:14.

Defendant freely went to his room to search for his cellphone. *Id*. at 79:15-17.  During this period, the agents casually conversed with another household member. *Id*. at 79:18-25 – 84:1-13. Defendant was allowed to freely retrieve the firearms that he claimed were still in his possession. Hr'g Tr. at 23:3-11. The agents verified the serial numbers on the guns in Defendant's possession. Nov. 10 Tr. at 79:1-2.

Once Defendant found the phone, agents presented him a consent-to-search form. *Id.* at 88:3-8. After Defendant read the form aloud, Hutson asked him, "do you agree to give us consent to search this device?" *Id*. at 89:8-9. He asked if agents would obtain a "search warrant sooner or later," to which Huston responded, "we may apply for a search warrant, and if we get one, then we would come back and get it" and told Defendant that "if we decided to get a search warrant and if the judge elected to give it to us, that we could search whatever the judge authorized us to search." *Id*. at 89:17-18, 90:1-3. Wozniak told Defendant that incriminating evidence found on the phone could be used against Defendant and that he had the right not to consent to a search. *Id*. at 91:1-8. Defendant did not consent to a phone search, saying "I'll just say no." *Id.* at 92:7. He said that he did want to help the agents in the long run, though, and gave Wozniak his telephone number after Wozniak asked for it. *Id*. at 92:14, 93:18-20.

Hutson gave Defendant his business card and told him to "reach out" if Defendant recalled new information. *Id*. at 94:13-25 – 95:1-3. Defendant again mentioned his intent to pursue a career in law enforcement and asked if this was an "active case" that could affect his employment prospects. *Id*. at 97:14-22, 98:10-11. Agents answered yes, the case was active, and Defendant asked, "how that works." *Id*. at 98:12-14. Wozniak responded that "if the U.S. Attorney's Office has a preference on what we do with this or where this goes, you'll be among the first to know." *Id*. at 98:18-20. As the agents left, the agents and Defendant exchanged pleasantries.

The encounter lasted about one hour and ten minutes. *Id*. at 2, 100. Agents never drew their weapons or physically restrained Defendant during the encounter. Hr'g Tr. at 21:20-25 – 22:1-7. Moreover, Defendant's father was "within ear shot at various points and kind of back and forth and around." Hr'g Tr. at 21:3-8.

### C. November 17, 2020 Search Warrant Application and Resulting Warrant

On November 17, 2020, Hutson filed a search warrant application to search Defendant's home. Govt.'s Ex. 2, ECF No. 45-2, 1. In a supporting affidavit, which Hutson submitted to the Court, Hutson detailed the investigation, including a description of an undercover firearm purchase from a convicted felon. *Id*. at 4; Hr'g Tr. at 91:5-13. According to Hutson, the recovered pistol was traced to Defendant, who was said to have purchased it on May 4, 2020, from BMC Tactical. ECF No. 45-2 at 1. In addition to detailing agents' tracing efforts, the supporting affidavit also discussed agents' review of gun dealer records and their interviews with Defendant and other individuals. *Id*. at 4-9. Hutson described his professional training and experience, federal laws he believed that Defendant violated and his belief that "evidence of these offenses will be obtained through a search of the Subject Premises." *Id*. at 3 (capitalization

omitted). Two paragraphs later, Hutson described the "Subject Premises" as Defendant's Albuquerque address and the names of five other possible residents. He wrote that Defendant's home was believed to contain evidence of mobile devices that Defendant used to illegally purchase firearms, guns that Defendant illegally possessed, firearm purchase records, and evidence of false statements that Defendant made to law enforcement officers.

He also wrote that the Subject Premises were more particularly described in Attachment A. *Ibid*. Attachment A is displayed in its entirety as follows:

### ATTACHMENT A

### Property to Be Searched - the SUBJECT PREMISES

The premises occupied by John CHAVEZ (YOB: 1997) located at 1524 Sunset Farm Road Southwest, Albuquerque, NM 87105 where myself and SA Wozniak interviewed CHAVEZ on November 10th, 2020, described as a single-story, tan-colored adobe single-family residence with the numbers "1524" affixed to structure facing the street (photograph included below). The search is to include all rooms, attachments, storage containers, out buildings, trailers/motorhomes, trash cans, and vehicles at the SUBJECT PREMISES.



*Id*. at 14.

Attachment B described the property that agents targeted. Attachment B is published in its entirety as follows:

**ATTACHMENT B**

**Evidence to Be Seized**

1. All items within the SUBJECT PREMISES which constitute evidence, fruits, and instrumentalities of Title 18, United States Code, Section 922(g) – Prohibited Person in Possession of a Firearm; Title 18, United States Code, Section 922(a)(6) – Knowingly Making False Statements in Connection with the Purchase of a Firearm; and Title 18, United States Code, Section 1001(a)(2) knowingly and willfully making materially false, fictitious, or fraudulent statements or representations in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, to include:

    a. Evidence of the above listed violations to include books, records, receipts, notes, ledgers, money order receipts, money orders, money remittance, bulk US Currency and other documents;

    b. Controlled substances;

    c. Firearms, ammunition, magazines, holsters, and items used to store firearms if possessed concurrently with controlled substances by CHAVEZ;

    d. Firearms parts, firearms accessories, and other items indicating firearms ownership, such as firearms manufacturer boxes (often labeled with firearm serial numbers), firearms cleaning kits, firearms manuals, and additional firearms parts – slides, barrels, trigger assemblies, grips, etc;

    e. Cellular telephones and other digital devices, such as computers, laptops, tablets, PDAs or similar electronic storage devices capable of communicating to other electronic devices;

    f. Articles of property tending to establish the identity of persons in control of the premises, vehicles, storage areas and containers being searched, including utility company receipts, rent receipts, addressed envelopes and keys; and

    g. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, locked cabinets and types of locked or closed containers and hidden compartments that may contain any of the foregoing.

*Id.* at 15.

      Hutson used a form warrant application, Form AO 106. As is apparent from, Hutson did not fill-out the blank portion of the form for describing property to be searched or seized, but instead wrote "See Attachment A" and "See Attachment B," and included those attachments. *Id.* at 1. (capitalization omitted). The Court displays the pertinent portions of the search warrant application as follows:

---

**APPLICATION FOR A SEARCH WARRANT**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):
SEE ATTACHMENT A

located in the _____ District of _____ New Mexico _____ , there is now concealed (*identify the person or describe the property to be seized*):
SEE ATTACHMENT B

---

*Ibid.*

On November 17, 2020, a federal magistrate judge approved the search warrant application and issued the warrant which the Court publishes below:

**SEARCH AND SEIZURE WARRANT**

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ New Mexico _____ (*identify the person or describe the property to be searched and give its location*):
SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal (*identify the person or describe the property to be seized*):
SEE ATTACHMENT B

Govt.'s Ex. 3, 1, ECF No. 45-3. As is apparent, the warrant referenced the same attachments – Attachments A and B – that had accompanied Hutson's warrant application. Moreover, the judge physically attached Attachments A and B to the warrant. *See* Search and Seizure Warrant, *United States v. Sealed,* 1:20-mr-01686-KK (D.N.M Nov. 17, 2020), ECF No. 2, 3-4.  The warrant did not attach or refer to Hutson's supporting affidavit.

### D. November 18, 2020 Encounter Between Agents and Defendant

Agents executed the warrant and spoke to Defendant on November 18, 2020 at 11:18 A.M. Transcript of Interview and Search Warrant Execution, 2:1-3, Govt.'s Ex. 4. About ten agents entered Defendants' home, displayed their weapons, and took Defendant into custody. Hr'g Tr. at 27:12 -25 – 28:1-8. Agents *Mirandized* Defendant before beginning their recorded

conversation with him. Mot. 9, ECF No. 38. After administering *Miranda* warnings and asking if he would speak to agents without a lawyer present, Defendant answered "Yes, because I could – I could – like I said, what – so what's happening after today?" Govt.'s Ex. 4 at 2:24-25 – 3:1-3.

Agents then began telling Defendant that he "lied to [them]" during the November 10, 2020 encounter. *Id*. at 3:6-7. They asked him when he last purchased a gun and the total number of guns that he had purchased. *Id*. at 3:10-25 – 4:1-25. Defendant said he purchased roughly eight or nine guns. *Id*. at 4:20-25 – 5:1-3.  Defendant interrupted Hutson at one point and in response Hutson said, "This is my time to talk, bro," and said that agents previously gave Defendant the opportunity to be honest, but that Defendant was lying by "not giving … the full story."  *Id*. at 5:7-23. Like the past encounter, agents said they were "hit[ting] the reset button" so Defendant could be truthful. *Id*. at 6:1-3.

Defendant guessed that he purchased 13 or 14 firearms. *Id*. at 6:21-22. They asked him to explain his inconsistent answers but told him that "we're not out to get you for anything." *Id*. at 7:6-7. Before answering, they asked him who else he purchased guns for besides El Chapo. *Id*. at 7:13-14. Defendant answered "nobody," but then said that he either purchased for or gave guns to "two other security guard friends" named Ryan Martinez and Alex Gonzalez. *Id*. 7:15, 8:3-4.

Defendant also said that he gave his mother two guns. *Id*. at 10:12-16. In response, Agent Wozniak told Defendant that he would "go find [Defendant's] mother today," and that if she did not have the two mentioned guns, then Defendant would "get[ ] another felony count in federal prison." *Id*. at 11:5-10. "So don't bullshit me on who's got the guns," Wozniak said. *Id.* at 11:12-13.

Hutson then showed Defendant video footage from a gun dealer from October 17th that apparently depicted Defendant and another individual whom Defendant identified as his

colleague, Ryan Martinez. *Id*. at 15:1-6. When confronted with the footage, Defendant initially said that he purchased a gun and then sold it Martinez two or three weeks later. *Id*. at 15:10-25 – 16:1-20. But he then admitted that he "hand[ed] off the gun to" Martinez as the two sat in the car of the gun dealer's parking lot. *Id*. at 18:21-25 – 19:4. Agents then repeated that lying to them was a crime and Wozniak stated that "every time you lie … it is a potential second felony charge for the crime you've already committed. You know what I mean?" *Id*. at 20:3-5.

Agents showed Defendant a photograph from October 2 of Defendant and another individual in a gun store. *Id*. at 20:15-16. When asked to identify the other individual, Defendant first said that the individual was Martinez, then said it was Alex Gonzalez. *Id*. at 20:15-22. He said he purchased an automatic rifle for himself. *Id*. at 21:3-5. Hutson said there were in fact "many transactions," not just a single automatic rifle purchase, but Defendant denied buying guns for anyone else. *Id*. at 22:16, 23:16-19.

At 11:38 A.M., about 20 minutes into the interview, Defendant asked for a lawyer and agents concluded the interview. *Id*. at 26:11-22.

The search warrant return noted that agents seized three firearms, ammunition, marijuana, and, as discussed in more detail below, two cellphones. Govt.'s Ex. 3 at 2.

**E. December 9, 2020 Search Warrant for Cellphones**

On December 9, 2020, Hutson sought a search warrant for the two cellphones.  Govt.'s Ex. 5, 1, ECF No. 45-5. Hutson attached a supporting affidavit to the warrant application. The affidavit sought permission to search "[t]wo wireless telephones seized from the residence of [Defendant], further described in Attachment A," and to extract and examine "electronically stored data described in Attachment B."  *Id*. at 3 (capitalization omitted).

Attachment A, entitled "Property to Be Searched – the Subject Devices," described the cellphones make, model, and any other identifying information that Hutson found on the external portions of the seized phones. *Id*. at 14. (capitalization omitted).

Attachment B, entitled "Evidence to be Seized" authorized the seizure of, *inter alia*,

- "Any subscriber information or contact information to include, names, addresses, telephone numbers, email addresses or other identifiers;"

- "Any call log information, including missed, incoming and outgoing calls and any information associated with those numbers;" [a]ny system data, location information data, or configuration information"; and

- "Evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edit, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history … including any form of computer or electronic storage (such as flash memory or other media that can store data)" and "any photograph or video format, and any content with smartphone applications such as WhatsApp, Snapchat, Marco Polo, Facebook and others that are stored" on the cellphones.

*Id*. at 15-16.

On December 9, 2020, a different federal magistrate judge authorized the search of the two cellphones for evidence of the charged violations. Govt.'s Ex. 6, 1, ECF No. 45-6.

Referencing Attachments A and B of Hutson's application, the warrant appeared as follows:

## SEARCH AND SEIZURE WARRANT

To:    Any authorized law enforcement officer

  An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____New Mexico_____
*(identify the person or describe the property to be searched and give its location):*

  **SEE ATTACHMENT A**

  I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

  **SEE ATTACHMENT B**

*Ibid.* The judge physically attached Attachments A and B to the warrant. *Id*. at 3-5.

  The warrant commanded the executing officer to "execute this warrant on or before December 23, 2020." *See* Fed. R. Crim. P. 41(e)(2)(A)(i) (stating that a "warrant must command the officer to … execute the warrant within a specified time no longer than 14 days.") Hutson began searching the cellphones on December 17, 2020 – within 14 days of obtaining the warrant – but he could not unlock them. Hr'g Tr. at 110:9-24, 112:23-25 – 113:1-9, 116:3-17. He asked another agent to complete the extraction, and the results of the extraction were given to Hutson about a month later. *Id*. at 113:10-13.

## PROCEDURAL BACKGROUND

  The four-count superseding indictment charges Defendant with making false and fictitious statements to federally licensed firearm dealers by representing on item 11a of Form 4473 that Defendant was the actual transferee/buyer of the firearm when he was not in violation of 18 U.S.C. § 922(a)(6)[4]. Superseding Indictment, 1-3, ECF No. 34. Count 1 charges Defendant

---

[4]  18 U.S.C. § 922(a)(6) makes it unlawful "for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a … licensed dealer … knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such … dealer …

with making false Form 4473 statements to BMC Tactical on May 4, 2020. Count 2 charges Defendant with making false Form 4473 statements to JCT Firearms on May 23, 2020. Count 3 charges Defendant with making false Form 4473 statements to BMC Tactical on June 1, 2020, and Count 4 charges Defendant with making false Form 4473 statements to JCT Firearms on October 17, 2020. *Ibid*.

## DISCUSSION

As grounds for his motion to suppress, Defendant argues that: (1) his November 10, 2020 statements were extracted without *Miranda* warnings; (2) his November 10, 2020 statements were involuntary; (3) his November 18, 2020 statements were involuntary; (4) the November 17, 2020 search warrant was not particular; (5) the December 9, 2020 search warrant was not particular; and (6) the cellphones were not searched within the December 9, 2020 search warrant's 14-day deadline.

### A. Defendant Was Not Under Custodial Interrogation During the November 10, 2020 Interview

#### 1. Fifth Amendment Framework

The Fifth Amendment states that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As interpreted by *Miranda v. Arizona*, 384 U.S. 436, 471 (1966), the Fifth Amendment requires that an individual subject to custodial interrogation be informed clearly and unequivocally of certain *Miranda* warnings which are "an absolute prerequisite to interrogation." "[T]wo requirements must be met before *Miranda* is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). "[A]ny

---

with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition."

confession obtained during a 'custodial interrogation' may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination." *United States v. Chee,* 514 F.3d 1106, 1112 (10th Cir. 2008) (citing *Miranda,* 384 U.S. at 444).

"Whether a person is in custody for *Miranda* purposes depends on the type of the encounter with police." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). "Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and a formal arrest— *Miranda*'s custody element is triggered only in situations associated with formal arrests." *Ibid*. Thus, a person is "in custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).

Determining whether an individual is in custody "is an objective, fact-intensive inquiry that focuses on the totality of the circumstances." *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021) (citation omitted). Relevant factors that inform the court's analysis are: "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the defendant] aware that [he or she] was free to refrain from answering questions, or to otherwise end the interview." *Ibid*. (citation omitted).

The Court is unaware of, and neither party addressed, how the Tenth Circuit allocates the burden of proving custodial interrogation. "Courts generally hold" that the defendant shoulders the burden to show that he was subjected to custodial interrogation. *United States v. Smith*, No. 5:12-CR-52, 2012 WL 5187922, at *4 (D. Vt. Oct. 18, 2012) (citing *United States v. Jorgensen,*

871 F.2d 725, 729 (8th Cir.1989) (defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis,* 792 F.2d 1299, 1309 (5th Cir.1986) (the defendant had "the burden of proving that he was under arrest or in custody.")) (other citations omitted). For purposes of ruling on this motion, the Court places the initial burden on Defendant to establish that he was under custodial interrogation.

### 2. Analysis

#### a) Defendant was not questioned in a police-dominated atmosphere

The first relevant factor – whether the questioning occurred in a police-dominated atmosphere – firmly weighs in the Government's favor. Indicia of a police-dominated atmosphere include a suspect's separation from his family and isolation in a nonpublic questioning room, the threatening presence of several officers, the display of weapons or physical contacted the suspect, and whether the officer's language and tone indicated that compliance might be compelled. *Chee,* 514 F.3d at 1113. The interview lasted about one hour and ten minutes in the middle of the day and at the Defendant's house. *See Guillen*, 995 F.3d at 1109 (questioning of defendant by two agents at his kitchen table for about an hour was not a police-dominated atmosphere because "[t]he home is generally a more familiar, comfortable atmosphere than a police interrogation room."); *United States v. Rith*, 164 F.3d 1323, 1332 (10th Cir. 1999) ("suspects are less likely to be found to have been in custody for *Miranda* purposes if they were interviewed in their own homes.") (citation omitted); *Cf. United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (concluding that questioning of defendant in her home was a police-dominated atmosphere when "at approximately 6:00 a.m., seven police officers abruptly roused Revels and Murphy from their bedroom after forcibly entering their home" and "immediately detained, restrained in handcuffs, and placed [the defendant] face down on the

floor.")  There is no indication that officers displayed weapons or physically touched Defendant. *See Rith*, 164 F.3d at 1332 (defendant was not in custody given that "officers did not draw their weapons, handcuff [the defendant], or otherwise impose physical restraint upon him.") In fact, Defendant denied agents' request to speak in a more private location and he moved unaccompanied through the house to obtain personal items. *See Guillen*, 995 F.3d at 1109 (concluding that the atmosphere was not police-dominated when the defendant was able to go unaccompanied in his house to use the bathroom, get a drink from the refrigerator, and was free to check his phone.) Rather than being isolated and separated from his family members, Defendant's father participated in the interview at least once. *See ibid*. ("Although a large number of law enforcement personnel were in the Guillen residence at various times, [the defendant]'s father and brother were also present in the home. In fact, [defendant]'s father participated in the interview at least once."); (*United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) (concluding that an hour-long interview was not custodial when it was "conducted by two officers in a common area of [the defendant's] home, during which his mother came and went from the room"). The Court concludes that the questioning did not occur in a police-dominated atmosphere and that this factor conclusively weighs in the Government's favor.

### b) Agents' questions did not place Defendant in custody

The second relevant factor – whether the nature and length of the officers' questioning was accusatory or coercive – weighs in the Government's favor. Defendant states that agents "targeted [him] for particular crimes and asked him accusatory questions clearly intended for particular crimes." Mot. at 6. True enough, Agent Wozniak asked – and Defendant admitted to – lying on Form 4473 for the sale of the four Glocks from BMC Tactical and admitted to "the [Glocks] 19 and 17 as well." Nov. 10 Tr. at 60:1-9, 60:15-16. He also admitted to lying on Form

4473 for the Desert Eagle purchase and to making three Form 4473 misrepresentations on behalf of El Chapo. *Id*. at 64:12-21. Such questions likely constituted interrogation for *Miranda* purposes. *See United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004) (stating that "interrogation encompasses not only questioning but any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (citation and quotation marks omitted).

However, the Court is unconvinced that agents' interrogation of Defendant was so accusatory or coercive as to place Defendant in custody. *Guillen* demonstrates why this is so. In *Guillen*, agents obtained consent to search the defendant's home for evidence of a homemade bomb. 995 F.3d at 1100. During that search, agents discovered inculpatory evidence. *Ibid*. Although the defendant repeatedly denied any wrongdoing during an in-home interview, he confessed to making the bomb when one of the agents confronted him with "mounting information and evidence collected during the search," including evidence of a missing pressure cooker and soldering iron, black powder burns and fuses on a table, and other inculpatory evidence. *Id*. at 1100, 1102, 1110. The Tenth Circuit held that the defendant was in custody once confronted with this "mounting" evidence from the search because with the search completed, little remained "for the agents to do other than to leave or place [the defendant] under arrest." *Id*. at 1111. "Considering the evidence the agents had discovered, an arrest was likely," the Tenth Circuit explained, and, "after being confronted with that evidence—a reasonable person in [the defendant's] shoes would have recognized as much." *Ibid*.

In sharp contrast to the facts of *Guillen*, agents did not search Defendant's house, collect damaging evidence, and then confront Defendant with "mounting information" of guilt. No

reasonable person therefore would have known that "an arrest was likely." When it came time to "arrest or leave," agents left – and did so after Defendant told them to get a warrant to search his phone, indicating that Defendant was not placed under arrest or the functional equivalent arrest. The Court concludes that the second relevant factor – the nature and length of the agents' questioning – weighs in the Government's favor.

### c) Defendant was not told he could leave or end the interview

The last factor weighs in Defendant's favor. The Government concedes that the agents had not informed Defendant that he was free to refrain from answering questions or to otherwise end the interview. *See* Govt.'s Resp. at 9. Agents' failure to do so was "a significant indication of a custodial detention." *Guillen*, 995 F.3d at 1109 (citation and quotation marks omitted). However, "it also is only one factor to consider." *Ibid*. (citation omitted).

### c) Weighing of factors

A weighing of the three custody factors shows that one factor – whether the agents made Defendant aware that he was free to refrain from answering questions or to end the interview – weighs in the Defendant's favor. However, the remaining two factors – the purpose of the questioning and whether police dominated the scene – weigh in the Government's favor and firmly point to the conclusion that Defendant was not subjected to custodial interrogation in violation of *Miranda* during the November 10, 2020 interview.

### B. Defendant's November 10, 2020 Statements Were Voluntary

### 1. Voluntariness Framework

Defendant also claims that his November 10, 2020 statements were made involuntarily. "[C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand." *United States v. Young*,

964 F.3d 938, 942 (10th Cir. 2020) (quoting *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)) (alteration in original). "Before *Miranda,* the Supreme Court had 'recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.'" *United States v. Cash*, 733 F.3d 1264, 1279 (10th Cir. 2013) (quoting *Dickerson v. United States,* 530 U.S. 428, 433 (2000)). "Although '*Miranda* changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements,' the Supreme Court 'never abandoned [the] due process jurisprudence, and thus continue[s] to exclude confessions ... obtained involuntarily.'" *Id*. at 1279-80 (alterations in original).[5] "Thus, even if a defendant is not subject to custodial interrogation—and therefore not entitled to *Miranda* warnings—his incriminating statements, if involuntarily produced, are inadmissible." *Id*. at 1280.

"To be admiss[i]ble, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *Young*, 964 F.3d at 942 (quoting *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993)) (alteration in original). A determination of voluntariness is based on the totality of the circumstances, *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998), and the reviewing court asks whether "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Erving L.*, 147 F.3d 1240, 1248–49 (10th Cir. 1998). In determining the totality of

---

[5]     Defendant's motion does not clearly state whether he challenges the voluntariness of his confession under the privilege against self-incrimination under the Fifth Amendment or the Due Process Clause. However, in *Cash* the Tenth Circuit explained that under either theory the question for the court is the same: whether "the totality of all the surrounding circumstances including both the characteristics of the accused and the details of the interrogation," indicate that the suspect's statement was voluntarily made. 733 F.3d at 1280.

circumstances, the court considers "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment." *United States v. Lopez*, 437 F.3d 1059, 1063–64 (10th Cir. 2006).  No single factor is determinative. *Id*. at 1063. The government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary. *Missouri v. Seibert,* 542 U.S. 600, 608 n.1 (2004).

### 2. Analysis

Defendant argues that the following factors rendered his statements involuntary: (1) agents' promises of leniency and alleged false representations; (2) the details of the encounter – including being unexpectedly awoken, not receiving *Miranda* warnings or being told he could end the encounter, and being "out of the presence of" family; (3) agents' "mental pressure and psychological coercion by badgering [Defendant] repeatedly with the same questions and suggestions they knew he was lying"; and (4) his individual characteristics – his youth, education level, and inexperience with the criminal justice system – that made him vulnerable to coercion. Mot. at 7-9.

Because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), the Court first analyzes the purportedly coercive conduct described in categories (1) – (3) - i.e., agents' alleged promises of leniency and misrepresentations, the conditions of the encounter, and agents' mental pressure and coercion. Only if the Court finds this conduct coercive will the Court then consider category (4), Defendant's personal characteristics. *See Young*, 964 F.3d at 943 (stating that "defendant's personal characteristics relevant if officers' conduct coercive") (citation omitted).

**a) The agents did not make promises of leniency or false representations**

Concerning promises of leniency, such promises "are relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." *Ibid.* (citation and quotation marks omitted). Defendant states that the agents impliedly promised leniency "by indicating they would help him if he answered their questions truthfully." Mot. at 8. But the Tenth Circuit has held that a similar statement by law enforcement – "If you work with us, we'll go easy on you" – was not a promise of leniency but was instead "vague," "non-committal," and could not "be understood to mean [the defendant] was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *United States v. Rodebaugh*, 798 F.3d 1281, 1293 (10th Cir. 2015) (citations and quotation marks omitted).

Moreover, police statements arguably more coercive than the case at bar have not qualified as promises of leniency. *See United States v. Garot*, 801 F.2d 1241, 1243-45 (10th Cir. 1986) (holding that there was no promise of leniency when an agent told the defendant that she could be in "big trouble," and that if she were to tell the truth about what occurred, the agent would relay the information to the prosecutor); *United States v. Mashburn*, 406 F.3d 303, 309-10 (4th Cir. 2005) (no implied promise of leniency where "'agents … told [the defendant] he was in very serious trouble, looking at five years for the gun on top of five years for the methamphetamine,' [] and that the 'only way that [he could] actually help [himself] in a federal system' was to provide 'substantial assistance.'"). The Court concludes that agents made no implied promises of leniency by allegedly indicating they would help him if he answered their questions truthfully.

Defendant also claims that the agents made "false representations." Mot. at 8. However, Defendant's motion does not identify what inaccurate statements agents made. At the suppression hearing, Defendant stated that agents employed a "ruse" when they approached him and made it falsely appear as though the gun dealer, not Defendant, was the subject of their injury. *See*, *e.g.*, Hr'g Tr. at 117:1-25.  However, even assuming agents' questioning created a "ruse," Defendant was not in custody at the time Agent Wozniak made this statement and the Court is unpersuaded that Defendant was so "overborne or coerced" by the statement that Defendant could not rationally choose among available courses of action. *Garot*, 801 F.2d at 1245. The facts are a far cry from *Young*, 964 F.3d at 943, 945, where agents misrepresented to a defendant that he could "physically buy down the amount of time you see in a federal prison," or implied that the agents had "access to a federal judge." The Court concludes that agents made no promises of leniency or misrepresentations that rendered Defendant's statements involuntary.

### b) The details of the encounter were not coercive

Defendant claims that his will was overborne by being suddenly awakened, not receiving *Miranda* warnings, not being told he could end the discussion, and being separated from family. Mot. at 8-9. The Court is unpersuaded that the conditions of the encounter arose to the level of coercion. Defendant was questioned for a little over an hour in his home or the doorway of his home and the agents neither spoke in a threatening tone nor displayed their weapons during the interview. Although agents awakened Defendant, there is no information that he appeared confused during their conversation. *See Cash*, 733 F.3d at 1282. In fact, he often volunteered information without being asked and a did a good bit of the talking. Contrary to Defendant's claim that he was separated from family, his father was in the vicinity and participated in the encounter at least once. That fact that Defendant was not advised of his *Miranda* rights is "not at

24

all dispositive," but is rather "one factor" among others that the Court considers in determining voluntariness. *Rith*, 164 F.3d at 1333. The Court concludes that the details of the encounter fail to show coercive conduct by agents that rendered Defendant's statements involuntary.

### c) Agents did not coerce Defendant by repeating the same questions and suggestions that he was lying

Defendant next claims that agents applied "mental pressure and psychological coercion by badgering [Defendant] repeatedly with the same questions and suggestions they knew he was lying." However, "an admonition to tell the truth (even if repeated) … without more" is not enough to constitute impermissible coercion. *United States v. Carpentino*, 948 F.3d 10, 28 (1st Cir. 2020) (rejecting the defendant's claim that "the repeated urging by various officers that he should tell the truth and cooperate coerced him into waiving his Miranda rights.") Although agents repeated the same questions and repeated their claim that Defendant lied, the overall context of the questioning fails to raise an inference that agents engaged coercive overreaching that thwarted Defendant's will.

Because agents did not coerce Defendant into making statements and because coercion is "a necessary predicate for an involuntary confession claim," *Cash*, 733 F.3d at 1281, the Court does not consider whether Defendant's personal characteristics such as his youth, education level or inexperience with the criminal justice system made him susceptible to police coercion. *See Erving L.*, 147 F.3d at 1249 (stating that a defendant's age, mental capacity, and personal idiosyncrasies were "constitutionally irrelevant absent proof of coercion."). In summary, Defendant's November 10, 2020 statements to agents were made voluntarily.

### C. Defendant's November 18, 2020 Statements Were Voluntary

Defendant also claims that his November 18, 2020 statements were coerced. Defendant analyzes his November 18, 2020 statements through the lens of the voluntariness framework

discussed *supra* whereas the Government analyzes his statements through the lens of waiver under *Miranda*. Regardless of whether the voluntariness of a suspect's statement is evaluated "through the lens of *Miranda* waiver, the privilege against self-incrimination, or the Due Process Clause, [the court's] inquiry is the same—[the court] consider[s] the totality of the circumstances." *Cash*, 733 F.3d at 1280 n.12.

As noted earlier, for Defendant's statements to be considered involuntary, the Court must first find that agents coerced Defendant when they spoke to him on November 18, 2020. *See id.* at 1281. The Court holds that the record is insufficient to support such a finding. Although the agents accused Defendant of previously lying to them and offered to "hit the reset button" Govt.'s Ex. 4 at 6:1-3, their statements did not amount to a promise of reduction in punishment or a promise that Defendant would fare better if he confessed such that his statements were involuntary. *See Lopez*, 437 F.3d at 1064 (confession involuntary where police effectively promised defendant he would spend 6 rather than 60 year years in prison if he admitted killing the victim); *Clanton v. Cooper*, 129 F.3d 1148, 1158-59 (10th Cir. 1997) *overruled on other grounds by Becker v. Kroll*, 494 F.3d 904, 917–19, 922–24 (10th Cir. 2007) (agent's statement to suspect that he would get 25-year sentence if he did not confess, but would get off lightly if he confessed, raised question of fact as to whether confession was voluntary). Agents also told Defendant that he could "get[ ] another felony count in federal prison," Govt.'s Ex. 4 at 11:5-10, if they discovered he lied. However, this may have been a truthful assessment of the severity of the crimes with which he could be charged rather than a threat that overpowered Defendant's will.

Finally, the Court is not persuaded by Defendant's claim that "courts have found that even the presence of more than one officer increases the coerciveness of an encounter," Mot. at 9

(citing *United States v. Williams*, 615 F.3d 657, 664 (6th Cir. 2010); *United States v. Saperstein*, 723 F.2d 1221, 1226 (6th Cir. 1983)). Those cases are inapplicable. The issue in those cases was whether the presence of one or more police officers contributed to a Fourth Amendment seizure. Those cases do not hold that the presence of several officers increases the coerciveness of an encounter to the point of overpowering a suspect's will. In any case, the circumstances of the interview do not indicate coercive conditions. Defendant waived his *Miranda* protections and spoke with agents for about 20 minutes, at which point Defendant asked for a lawyer and the interview ended. *See Erving L.*, 147 F.3d at 1251 (holding that a defendant's confession was voluntary because, among other things, "the officers ceased questioning" after the defendant invoked his right to remain silent). Considering the totality of the circumstances, the Court detects no police overreach to support Defendant's claim.

Because officers did not engage in coercive activities, the Defendant's statements during the November 18, 2020 encounter were voluntarily made.

### D. The November 17, 2020 and December 9, 2020 Warrants

#### 1. Fourth Amendment Framework

The Fourth Amendment provides that "no Warrants shall issue" without "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  These are the only "two matters that must be particularly described in the warrant." *United States v. Grubbs*, 547 U.S. 90, 97 (2006) (citation, quotation marks, and alteration omitted). This is referred to as the "particularity requirement." *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021). Under that requirement, "a search warrant must describe the items to be seized with as much specificity as the government's knowledge and circumstances allow." *Ibid*. (citation and quotation marks omitted). A court reviewing a warrant must "construe search

warrants in a practical and commonsense fashion, avoiding a hypertechnical reading of their terms." *Id*. at 1125.

The Fourth Amendment "'requires particularity in the warrant, not in the supporting documents.'" *United States v. Cooper*, 654 F.3d 1104, 1126 (10th Cir. 2011) (quoting *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). This is so that "the description of what is sought to be seized is written in, or incorporated into, the warrant to ensure that the executing officer(s) stay within the specific bounds set by the issuer." *Suggs*, 998 F.3d at 1136. Under the Fourth Amendment, a warrant may cross-reference other documents such as an affidavit, which may allow the warrant in some circumstances to satisfy the particularity requirement. *Cooper*, 654 F.3d at 1126 (quoting *Groh*, 540 U.S. at 557).

### 2. Analysis

Defendant first claims that the warrants violated the particularity requirement because "while the [November 17, 2020] warrant … referred to Attachments A and B to Hutson's affidavit, it did not incorporate the affidavit or its attachments into the warrant." Mot. at 10. Concerning the December 9, 2020 warrant, Defendant claims that the warrant did not incorporate Attachment B.[6]

#### a) The warrants incorporated their attachments, but the warrants did not incorporate the underlying affidavits

Both warrants here expressly incorporated the referenced attachments. In *Suggs*, the court held that a warrant expressly incorporated an attachment listing the targeted property when the warrant stated: "See Attachment 'B' which is hereby incorporated in reference." 998 F.3d at 1136. The warrants here also used similar words of incorporation by stating "See Attachment A"

---

[6]     Defendant makes no argument about whether the December 9, 2020 warrant incorporated Attachment A.

and "See Attachment B." Although the warrants did not utilize the clause, "which is hereby incorporated in reference," as in *Suggs*, absence of this language does not defeat incorporation. "[T]here are no required magic words of incorporation." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 700 (9th Cir. 2009). Only "suitable words of reference" are required. *Suggs*, 998 F.3d at 1135. Other courts have found identical language suitable. *See United States v. Beal*, 730 F. App'x 30, 33 (2d Cir. 2018) (concluding that warrant's statement to "See Attachment B" was valid); *United States v. Gosy*, No. 16-CR-46, 2019 WL 948179, at *9 (W.D.N.Y. Feb. 27, 2019) ("the warrants instruct the reader to 'See Attachment B' for the description of the property to be seized. This is sufficient to incorporate Attachment B."); *United States v. Burke*, No. CR 9-60007-AA, 2010 WL 4641695, at *1 (D. Or. Nov. 4, 2010) ("'See Attachment B' is a plain and straightforward manner to incorporate the attachment by reference[.]") The Court holds that the November 17, 2020 and December 9, 2020 warrants suitably referred to, and incorporated, their respective attachments.

However, neither warrant incorporated Hutson's underlying affidavit. Recall that to satisfy the incorporation requirement, "(1) the warrant and the affidavit must be attached; and (2) the warrant must expressly incorporate the affidavit." *Suggs*, 998 F.3d at 1135. Attachments A and B were physically attached to both warrants, but Hutson's affidavits were not. *See* Search and Seizure Warrant, *United States v. Sealed,* 1:20-mr-01686-KK (D.N.M Nov. 17, 2020), ECF No. 2; Search and Seizure Warrant, *United States v. Warrant,* 1:20-mr-01784-KBM (D.N.M Dec. 9, 2020), ECF No. 2. Nor did the warrants use language of express incorporation when viewed against *Suggs*, where a "warrant plainly incorporated the underlying affidavit" when the warrant provided that, "A copy of the Affidavit is attached and made a part of this Search Warrant." 998 F.3d at 1136 (citation omitted). Here, the only references to an affidavit in both

warrants were contained in the issuing judges' findings "that the affidavit(s) … establish[ed] probable cause to search and seize the person or property described …." However, "a warrant does not incorporate an affidavit merely by mentioning the affidavit or reciting that the magistrate judge found probable cause to authorize the search." *Suggs*, 998 F.3d at 1135. Thus, Hutson's affidavits were not incorporated into either the November 17, 2020 or the December 9, 2020 warrant.

### b) The good-faith exception to the exclusionary rule applies

If, *arguendo*, Hutson's unincorporated affidavits somehow rendered the warrants invalid, the Court agrees with the Government that the good faith exception to the exclusionary rule applies because the agents' reliance upon the warrants was objectively reasonable. In *United States v. Leon,* 468 U.S. 897, 920 (1984), the Supreme Court adopted a good-faith exception to the application of the exclusionary rule and specifically applied that exception where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even though the search warrant was later deemed to be invalid. *See United States v. Nelson*, 868 F.3d 885, 891–92 (10th Cir. 2017) (stating that "suppression [is not an] appropriate remedy when [an] officer relies in good-faith on a third party's mistake") (citing *United States v. Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006)). "[C]ourts have the discretion to proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000).

Even though Hutson's affidavits were not incorporated into the warrants, the affidavits nevertheless certainly established probable cause. As noted earlier, both magistrate judges had before them the affidavits, as evidence by their findings that "that the affidavit(s) …

establish[ed] probable cause to search and seize the person or property described ….” In determining whether a search warrant is supported by probable cause, the reviewing court examines “the sufficiency of the affidavit upon which a warrant is issued by looking at the totality of the circumstances and simply ensuring that the magistrate had a substantial basis for concluding that probable cause existed.” *Cooper*, 654 F.3d at 1124 (citation and quotation marks omitted). The highly detailed November 17, 2020 search warrant affidavit listed federal firearm laws Defendant allegedly violated and provided exhaustive information about the agents’ investigation. Hutson explained in his affidavit that Defendant communicated about firearm transactions using Snapchat on multiple devices, and that based on Hutson’s professional training and experience, evidence of these communications was likely to be stored on cellphones. His affidavit thoroughly explained why every item listed in Attachment B could conceivably be connected to linked to criminal activity. The November 17, 2020 affidavit provided the magistrate judge a substantial basis to believe that probable cause existed to search or seize the targeted property, even if the affidavit was not physically attached to the warrant.

The December 9, 2020 search warrant affidavit also established probable cause. The affidavit explained in a highly detailed fashion how suspects use cellphones to facilitate criminal activity. *See* Govt.’s Ex. 5 at 9-10. For example, the affidavit explained how a cellphone’s stored list of recently received, missed, and sent calls, through cell service or other applications, helps identify telephone or application users in contact with the suspect. *Id*. at 9. Hutson recounted in the affidavit that El Chapo would call Defendant on Defendant’s old cellphone and that the calls or communications would occur on Snapchat. *Id*. at 6. The affidavit also recounted Defendant’s statement that he had his “new cellphone” for two years, and thus his possession of the new phone was “well within the time frame of his transactions” with El Chapo. *Ibid*. These facts

amply justified the magistrate judge's determination that probable cause existed to seize the items listed in Attachment B to the December 9, 2020 search warrant.

In sum, even if the unincorporated affidavits somehow rendered the search and seizure warrants invalid, the good faith exception to the exclusionary rule applies because the agents' reliance upon the warrants was objectively reasonable.

### E. Federal Rule of Criminal Procedure 41 Was Not Violated

The December 9, 2020 warrant to search the cellphones commanded the executing agent to "execute this warrant on or before December 23, 2020." Hutson apparently attempted to unlock the cellphones within 14-days of December 9 but was unsuccessful. He transmitted the devices to Agent Supnick, an "on-site" or local ATF agent. Supnick extracted the phones' content and delivered the results about a month later. Defendant contends that the data extraction was untimely under the December 9, 2020 warrant. He states that the phones were seized during the November 18, 2020 search, and that the Government's "on-site copying of information was done after the December 23, 2020, time limit" and thus asks the Court to suppress the extracted data from his cellphones. Mot. at 16-17.

In support of his argument, Defendant moves under Federal Rule of Criminal Procedure 41(e)(2)(A)(i), which requires a warrant to be executed "within a specified time no longer than 14 days." Rule 41 has a specific provision for warrants seeking electronically stored information. *See* Fed. R. Crim. P. 41(e)(2)(B) (stating that "[t]he time for executing the warrant ... refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."). Rule 41 has been interpreted to "set a deadline only for when the physical cellphone itself had to be seized, and not for when its data were to be extracted." *United States v. Cleveland*, 907 F.3d 423, 431 (6th Cir. 2018); *see id.* at 430 ("a warrant's execution date

govern[s] only the date by when the seizure of the device, or, alternatively, on-site copying of the device, must occur, and not when off-site investigation and analysis of its contents must be completed.").

No Rule 41 violation occurred. The magistrate judge signed the warrant authorizing the search of cellphones that were already in the Government's custody pursuant to a lawful seizure from November 18, 2020.  On December 17, 2020, Hutson attempted on-site copying of the device within the 14-day period and therefore executed the warrant within the correct period. That Hutson was unsuccessful and "that the subsequent extraction occurred after the warrant's execution date" is immaterial. *Ibid*.

## CONCLUSION

For the reasons explained herein, it is hereby **ORDERED** that Defendant John Chavez's Motion to Suppress Statements and Physical Evidence and Request for an Evidentiary Hearing **(ECF No. 38)** is **DENIED**.

**IT IS SO ORDERED**.

HONORABLE JUDITH C. HERRERA
Senior United States District Judge

33